# Illinois Central Railroad Company v. Emma Beebe, Adm'x, etc.

1. RAILROADS—*An Owner of Stock Carried with Them is a Passenger.*—A person traveling by consent of a railroad company, upon a freight train, in charge of stock which is being carried for him, is a passenger for hire and entitled to the rights of such a passenger.

2. SAME—*Rights and Duties of Drover Traveling with Stock.*—A person traveling on a freight train in charge of stock under a contract requiring him to "take care of his stock" and to "ride in the caboose," went into a freight car to water his stock, by the direction of the conductor, and while there the train was started and he was thrown off and injured. *Held,* that such person had no right to stay in the freight car longer than was necessary to properly care for his stock, and that if he did he was guilty of such contributory negligence as to prevent a recovery, but if without his fault, he was not allowed a reasonable time to give them proper care, and had no notice of the intention to start, he was not guilty of such negligence.

3. CONFLICT OF LAWS—*Application of the Lex Loci Contractus.*— Where a contract is a unit and is to be performed in part in the State where made, the *lex loci contractus* must govern as to its nature, interpretation and effect, and if the contract is void or illegal by the law of the place where made, it will be held void and illegal everywhere.

4. CARRIERS—*Can Not Limit Liability for Negligence.*—Carriers of passengers are required to exercise the highest reasonable and practicable skill, care and diligence for the safety of their passengers, and this duty is imposed by public policy, and responsibility for damages caused by its breach can not be limited by contract to such as result from gross negligence.

5. SAME—*Presumptions as to Cause of Injury to Passenger.*—The happening of an accident to a passenger during the course of his transportation raises a presumption of negligence and the burden of rebutting this presumption is upon the carrier.

6. TRIALS—*Improper Remarks by Counsel—Presumptions Regarding.* —Every reasonable presumption will be indulged that a trial judge has performed his duty, and has permitted no misconduct of counsel materially injurious to the opposite party.

**Trespass on the Case.**—Death from negligent act. Appeal from the Circuit Court of McLean County; the Hon. THOMAS F. TIPTON, Judge, presiding. Heard in this court at the May term, 1896. Affirmed. Opinion filed January 29, 1897.

WILLIAMS & CAPEN, attorneys for appellant.

FIFER & BARRY and A. B. DAVIDSON, attorneys for appellee.

MR. JUSTICE PLEASANTS DELIVERED THE OPINION OF THE COURT.

Action on the case by appellee against appellant, for alleged negligence in causing the death of her intestate. The jury found the issue for plaintiff, assessing her damages at $5,000. A new trial was denied, judgment rendered on the verdict and this appeal taken.

Deceased shipped a car load of horses and household goods at Webster City, Iowa, for Lebanon, Indiana, via Dunleith, Freeport, La Salle and Wenona, Illinois, on a through freight train of appellant for Chicago, which left between seven and eight o'clock in the morning of April 15, 1894. At Freeport, where it arrived some time after eleven o'clock P. M., his car was taken out and placed seventh after the engine in another train, going south.

The shipping contract provided that "the owner will feed, water, and take care of his stock at his own expense and risk. Free transportation will be given to the owner or his *bona fide* employe in charge of the stock, as per current instructions given to agents. Persons so passed will be conveyed at their own risk of personal injury from whatever cause, except injuries arising from gross negligence of the railroad company, and must ride in the caboose attached to the train conveying the stock."

At La Salle, the train stopped to change engines, and there the deceased, pursuant to an understanding with the conductor, watered his horses. They were in the back part of the car, with their heads to the east, going south, and separated from the household stuff by a two-by-twelve inch plank nailed across it some three feet above the floor. There were seven in all, of which the one next to the plank was a small broncho pony which had been used several years for family driving, and was very gentle. In front of them was a manger filled with hay and some sacks of oats. The east door could not be opened on account of the goods as loaded.

In watering the stock, deceased was assisted by the conductor and the rear brakeman. When the last bucket was handed up to him, the train started out, and without again stopping ran twenty miles south to Wenona, where it arrived a little after six o'clock on the morning of the 16th.

There appellant's road, at a point 1250 feet north of its station crossed that of the Chicago & Alton Company, on an up grade going south of thirty four feet to the mile. The train, composed of nine loads and five empties, having made the usual stop for this crossing, started up, ran to the south end of the yard, a short distance south of the station, stopped there only to set out a car, and went on.

While making this crossing the deceased, who had remained in his car all the way from La Salle, fell or was thrown out of its west door, and his right foot and ankle, being somehow caught under the wheel, were crushed. Within three hours they were amputated by Dr. Ensign, the company's local surgeon, from Rutland, assisted by Dr Potts, of Wenona. The operation was properly performed and he was left in the care of an experienced nurse, to be under Dr. Potts' direction. The surgeons did not anticipate a fatal result, but just before noon of the next day signs of serious internal injury appeared—swelling and discoloration of the abdomen, with severe pain—and toward seven o'clock in the evening he died. The two named were the only surgeons who saw him, but two others, testifying hypothetically, concurred in their opinion that death was caused by internal injury producing peritonitis, and not the crushing or amputation of the limb, though the tendency of the latter was to aid the effect of the former by reducing the power of the system to resist it. He was of a fine physical form, sober, industrious, in vigorous health, and died in his thirtieth year, leaving appellee his widow, and one child, a son about three years of age.

The allegation of negligence in each of the counts was substantially the same, that the train having come almost to a stand-still, the engineer negligently, carelessly, suddenly, violently and without warning, started the engine

forward, and thereby with great force and violence jerked the car in which deceased was a passenger, by means of which he was thrown down and out of it, and received injuries in his back, side and legs, and internal injuries, from which he died.

It is earnestly contended for appellant that the verdict was manifestly against the weight of the evidence, if not wholly unsupported by any on every material point; that there was no unusual violence in the jerking or bumping of the cars, but only such as is inevitable to freight trains in taking up slack; that the accident was due to the negligence of deceased in being near the open door or in the car at all at that time; and that his death was caused, not by the accident or the consequent surgical operation or both combined, but by internal injuries produced by the kicks of the pony on the day and evening before.

Six witnesses testified to the very unusual violence of the bumping and jerking of the cars in making the crossing. Dr. Potts, having come home after being all night in the country on professional service and dozing on a lounge, was aroused by them. He said there were three or four, of which one or two were very loud and violent, jarring his house a hundred and sixty feet away. Mrs. Elsazer, residing near the crossing, while at breakfast heard the unusual bumping and watched the train to see what they were doing to cause it. Her statement was that "after it got partly over the crossing it was bumping harder; came almost to a stand-still; then they gave this hard jerk that jerked him off." She was the only witness who saw him inside the car, and said he appeared to have been first thrown down, with his face toward the door, and was endeavoring to rise when the hard jerk threw him forward; that he tried to hold on to the door, but was thrown out upon the ground "with great force;" and that she had never before heard bumping as hard as this—"nothing like that one bump."

Her husband, a section foreman of the Chicago & Alton R. R. Co., said the bumping on this train was harder than usual.

W. S. Clark, a laboring man, stated that "the jerks were severe, more than usually so," and that "one was louder than he had ever heard." Two others—a laborer and a teamster—so characterized the crossing movement generally, and one jerk particularly.

These witnesses were all strangers to the deceased and to the parties, having no interest whatever, directly or by relation, in the event of the suit. Their judgment was not an afterthought suggested by the accident. Their attention to the violence of the jerking was aroused before they saw the train or knew that any accident had occurred, and their recollection fixed by its occurrence, of which they immediately learned.

For appellant, a teamster and a farmer, hauling cinders for the city, who were on opposite sides and within forty feet of the train when it crossed, waiting for it to pass, testified that they observed nothing unusual in the jerking or bumping of the cars; and four of the crew, conductor, engineer, fireman and brakeman, together with the company's station agent at Wenona, that it was only such as necessarily occurs in taking up slack, and its violence on the occasion in question was not at all uncommon.

It is said the train hands had better means and opportunity of knowing whether there was or was not anything uncommon in the manner of crossing than had the witnesses for appellee; that if what they stated was not true they must have been guilty of perjury; and that they were conclusively corroborated by the fact that no coupling was broken, nor other injury done to the train.

If counsel for appellant, of large experience in litigation of this character, really regard that fact as conclusive of the question, as no doubt they do, it might reasonably be expected that employes on a freight train would so regard it and honestly so testify. But we apprehend that jurors and judges do not, nor will, as against positive and disinterested evidence to the contrary. And opportunities may be so common as to be overlooked or disregarded in particular instances. Train hands, constantly used to these jerks and

bumps, of different degrees of violence, expecting them on every start, prepared for and almost instinctively adjusting themselves to them, and intent upon their own work at the time, might easily fail to so notice even an uncommon degree of it on a particular occasion as to remember it for an hour, unless it resulted in some such injury to the train, interrupting their work, or other accident immediately known. Here there was no such reason for remembering anything in particular about it. They knew nothing of the unfortunate accident until the train reached El Paso, nearly, if not quite, an hour's run from Wenona, where they were informed of it by telegram, and not then, so far as appears, that it was supposed to have had any connection with the jerking or bumping of the car. It is therefore not strange that they then recalled nothing as unusual in making that crossing, and there is no room for a suspicion of perjury in their testimony to that effect. It is true that the form of most of their statements as abstracted was positive that there was nothing unusual in it—but from the nature of the case, as relating to a particular car which might be more affected than others, it would seem to be, in force and effect, merely negative. Only one of them was shown to have been near that car at the time. He was on top of the car next ahead of Beebe's and a witness testified that when they started and jerked it, it kind of raised, as it often does with a quick jerk. The proper positions of the engineer, fireman and brakeman were all remote from it, and that of the conductor does not appear. Mrs. Elsazer's statement of what she alone saw is quite as persuasive as that which, in common with the other witnesses for appellant, she heard; they are quite as strongly corroborated by the undisputed effect upon the deceased as are the adverse witnesses by the fact that no coupling was broken nor the train otherwise damaged; and perjury could be better assigned upon their positive statements, if false, than upon those of appellant's employes.

Upon the question of unusual violence there was manifestly such a conflict as forbade the court's taking its decis-

ion from the jury according to their belief from a preponderance of the evidence. It was their part to determine not only whether the management of the train in making the crossing was improper, but also whether, if improper, it amounted to negligence making appellant liable for the injurious consequences, if any such resulted without fault of the person injured; and we are satisfied with their finding on both points.

Did this negligence directly cause the injury which resulted in Beebe's death.

It certainly threw him out of the car, and thereby caused the injury to his limb which required its amputation, followed soon afterward by his death. But the surgeons were of opinion that his death was attributable, immediately, not to the crushing of the limb nor to the surgical operation required, but to internal injury produced by some violence causing peritonitis; and it is claimed for appellant that this violence was a kick or kicks by the broncho pony.

Henry E. Thompson, a live stock dealer and friend of the deceased, who was on the train with him from Webster City to Freeport, having three cars of cattle in it for Chicago, testified that just before they arrived at Waterloo, which was about noon, the deceased, accompanied by the witness, went to his car to feed his horses, and getting down under the plank that separated them from the household stuff, hit the pony with his elbow, which scared her, and she jumped on him and kicked him; that between five and six o'clock in the afternoon, they again went to that car for the same purpose, and under like circumstances deceased was again kicked by the pony; that he said she kicked him in his right side above the hip, and to the witness, "Look where she kicked me," but he, upon examination, "couldn't see any place whatever." They played cards during most of the evening and parted at Freeport near midnight. As deceased stepped off the caboose at Freeport he said, " My side hurts me yet, where that pony hit me, but I guess it won't amount to much." About five o'clock the next morning, at La Salle, he watered his horses,

and although this was about twelve hours after he received
the last kick, it doesn't appear that he then seemed to be at
all ailing.    Between one and two hours later—just after he
was thrown out of the car and his limb was crushed, at
Wenona—Dr. Potts examined him, and saw " no trouble
except the leg, until about twenty-four hours after the am-
putation," when he found some " about the upper portion
of the abdomen, like a bruise, and perhaps one on the left
hip and shoulder."    Dr. Ensign, who performed the ampu-
tation, says:    " I found him complaining of his injured limb
and of his hip; with a crushed foot and ankle.    I saw no
other marks of violence; his limb was not dislocated.    There
was a slight abrasion on the left side of his foot and a very
small settling of blood on the other limb.    These were
small matters.    After the amputation I examined his abdo-
men.    It seemed to be in its normal condition."    On cross-
examination he added:    " He complained of his hip.    I
examined it, and there was a little blue spot, a little abra-
sion of the skin on the left side, probably received with the
injury.    I examined him carefully.    He thought his hip
was displaced; complained of nothing but his foot and his
hip."    This was sixteen hours or more after he received the
last kick from the pony.

The nurse employed by the company's surgeon to take
care of him from the time of the amputation until he died,
a man of many year's experience as a nurse, discovered, a
little after noon of the day following the operation, that
his abdomen was bloated and swelling, and he complained
of pain there.    That was only seven or eight hours before
his death and more than thirty-six after the kick.

The testimony of Doctor White, uncontradicted, was that
peritonitis may be caused as well by a violent fall on the
stomach and abdomen upon a smooth, hard surface, as by
the kick of a horse; and when caused by violence is usually
developed within a few hours, scarcely ever going beyond
a day.

Here, then, is much evidence clearly tending to prove
if Beebe died of peritonitis, it was caused by just such a

fall and not by the pony's kick. While trying to rise from a recumbent position, with his face down, he was thrown out "with great force" from the height of a freight car floor. The declaration alleged "internal injuries," among others, of which he died; and this also was a question of fact for the jury. That they found the preponderance on the side of appellee is to us no matter of surprise.

Was the deceased chargeable with contributory negligence ? It is asked why was he in the door, and suggested as a probability, that "he had been asleep, waked up and found they were in a town, stepped to the door to look out, and his nerves being unsteady, tumbled out." The uncontradicted evidence is that he was not in the door of his own volition, but at a safe distance from it, when he was thrown down toward it by one jerk or bump, and then, despite his efforts to prevent it, and before he could rise, hurled out by another and a harder one. Appellant's witness Hall, who was on the west side and within thirty feet of the train, says, " I did not see the man in the door, as it passed me," and that "just as the caboose crossed I looked down the track and saw him fall from the car;" thus corroborating, as far as he goes, the statement of Mrs. Elsazer.

The question remains, by what right was he in that car ? By his contract he was bound to " ride " in the caboose, and it is the law that if in violation of that contract he was riding in the stock car when he was injured, ordinarily there could be no recovery of damages for the injury sustained while so riding and in consequence thereof.

But he was a passenger for hire on the train, and entitled to all the rights of such, except as limited by his special contract. N. Y., C. & St. L. R. R. Co. v. Blumenthal, 160 Ill. 40, and cases there cited. By that contract he was bound " to feed, water and take care of his stock." By that contract, therefore, as well as by an express understanding with the conductor, he was rightfully in that car, for that purpose, at La Salle. He could be there without riding in it only in case the train should be stopped long enough, at proper times, to give him a reasonable opportunity to

accomplish his purpose and get back to the caboose. Was such an opportunity given him at La Salle?

There was but little evidence on this point, and it was all from the train hands. Upon inquiry the deceased was told by the conductor that he could water his horses at La Salle; that there was a hydrant at that station and he would stop his car there to enable him to do so. They reached it at the early hour of five o'clock. Whether there was any work for the train there, except to change engines, was not shown; but it may be inferred from other facts that there was not. The water was brought from the hydrant in a bucket or buckets by the conductor and brakeman, who, from the side of the car, passed it up to the deceased in the door. Brakeman Calam, who was standing on the station platform watching them, being asked " How long did it take?" answered, " Probably two or three minutes." Without holding him to strict accuracy in such a statement, it seems reasonable to infer from the circumstances that it was a brief and hurried performance, and that immediately after the last bucket was handed up the conductor signaled the engineer and the train was started, without notice to the deceased of the intention then so to do. He had seven horses to water, and otherwise care for, if necessary or proper. Their heads were to the side of the car opposite to that of the door at which the water was handed up, and they were so close together that at Clinton they were found to be hot and steaming. This may have made them restive, and required attention to their halters and mangers at La Salle. He had to go under or over the separating plank mentioned to reach six if not all of them. Butcher, who was understood to have left the State and whose whereabouts were unknown, did not testify, and the conductor at this critical point said only that Beebe " stayed in the car," without an intimation, because he did not nor could not know that when the train started Beebe was not still actively and with all due promptness employed about his rightful duty to his horses, or had notice of his intention to start the train when he did.

If, without necessity for further attention to them, he chose to stay and ride in that car, he was chargeable with such contributory negligence as should prevent any recovery in this case. But if, without his fault, he was not allowed a reasonable time to give them all needful or proper care, and had no notice of the intention to start, he was not. And that also was a question for the jury.

It was a light train and a fast one—ranking next to a passenger—and therefore readily acquired speed. Beebe was not bound to omit any proper care of his stock, nor to risk an attempt to get out of a freight car in motion, and on a caboose seven car lengths behind it, rapidly increasing its speed; and the next stop was at Wenona, where the accident occurred.

Upon this question the jury were properly instructed, and were not without evidence from which they might reasonably infer that by the undue haste of the conductor in starting the train at La Salle, and without fault of the deceased, his staying in the car was fully justified or excused. For it was obviously a question of vital importance to appellant; and of those having knowledge of the facts bearing upon it who could tell? There were none but its servants; and not one of them leaves an impression that there was an interval between the handing of the last bucket and the signal to start of as much as ten seconds, or time enough for the last horse watered to get his drink and for Beebe to get back to the caboose, to say nothing of other care for his stock that might have appeared to be and actually was necessary or proper. For the rule as to the burden of proof of a negative averment or claim (that Beebe was not allowed sufficient time), and the presumption from the want of evidence, where it is not in the power of plaintiff and is in that of defendant, see Great Western R. R. Co. v. Bacon, 30 Ill. 347.

Since the case was submitted we have been referred to Heumphrens v. The F. E. & M. V. R. R. Co., 65 N. W. Rep. 466, but do not perceive that any question here made was there involved, or touched even incidentally. The

shipping contracts were alike, but there it was claimed that by custom, shippers of live stock in less than a car load were authorized to ride in the car with their stock, and evidence to prove it was admitted on the trial, over objection by the company. A majority of the reviewing court held that the evidence produced was not sufficient to prove the alleged custom, and that if it were it could not override an express contract to the contrary—the presiding justice dissenting. Here no such claim was recognized by the trial court or made by the appellee. On the contrary, the jury were expressly instructed that the contract bound the deceased to ride in the caboose, except when necessarily or properly employed in the duty of feeding, watering and properly caring for his stock; and that unless he was so there at the time of the accident, they should find for the defendant.

Much time has also been given to the consideration of another provision of the contract, viz., "that persons so passed will be conveyed at their own risk of personal injury from any cause whatever, except injuries arising from gross carelessness of the railroad company;" of which it is said there was no evidence.

The contract was made in Iowa. Of the transportation thereby contracted for, one hundred and seventy miles was in that State, and the residue through Illinois and in Indiana, where it was to terminate. The cause of action, if any, which was transitory, arose in Illinois, where the suit was brought. Appellee introduced in evidence section 1308 of the Iowa Code, which declares that "no contract, receipt, rule or regulation shall exempt any corporation engaged in transporting persons or property by railway from liability of a common carrier of passengers, which would exist had no contract, receipt, rule or regulation been made or entered into;" and also the opinion in McDaniel v. C. & N. W. Ry. Co., 24 Iowa, 412, in which it was held that by that provision a contract made in that State and limiting the common law liability of the carrier of goods shipped from there to Chicago was made void and could not be enforced in Iowa.

It is claimed on behalf of appellant that this statute could

have no extra-territorial force; that "where a contract is to be performed partly in one country and partly in another, each portion is to be interpreted according to the laws of the country where it is to be performed," citing 3 Am. & Eng. Encyc. of Law, 545, and two adjudged cases; and that the contract here considered is not forbidden or disallowed by the common law or that of Illinois, for which no authority is cited.

The only provision in the contract that is questioned is the one that attempts to limit appellant's liability for personal injury to the deceased. In denying or giving effect to that provision the Illinois court is not denying or giving extra-territorial effect to the Iowa statute, but simply applying the Illinois rule for the construction of an alleged contract made in Iowa. Its validity and effect must l e determined by some law, to be ascertained and fixed by some rule. In Pennsylvania Co. v. Fairchild, 69 Ill. 260, the rule for such a case was declared to be well settled and to have been often recognized by that court, that "contracts are to be construed according to the laws of the State where made, unless it is presumed from their tenor that they were entered into with a view to the law of some other State." There the goods were shipped at Valparaiso, Indiana, consigned to appellee at Leavenworth, Kansas, by delivery to the P., Ft. W. & C. Ry. Co., whose road was then under control of appellant and terminated at Chicago. With the goods there was also delivered the customary shipper's order, containing besides the usual description of the package, destination and name of consignee, the further statements that it was "delivered to the Pennsylvania Company, operating the Pittsburg, Fort Wayne & Chicago Railway," and "to be shipped as per directions below, subject to the conditions and exceptions of the company's bill of lading." The bill of lading contained an agreement to carry the goods to the company's freight station in Chicago, limiting its liability to its own line, and an exception for loss occasioned by fire. The goods, leaving Valparaiso on the evening of October 5, 1871, were transported to Chicago

and there delivered into the custody of the Chicago & Alton
R. R. Co. on the 7th, and while in the car of the latter com-
pany were destroyed by the great fire of October 8th and
9th, 1871.  Evidence was introduced by appellant to the
effect that by the law of Indiana, where the destination is
beyond the line of the carrier receiving the goods, if it de-
livers them to the one next in line of transit, it will not be
liable for their loss thereafter; but the trial court refused to
admit in evidence the shipper's order and bill of lading, and
instructed the jury that "if the Pennsylvania Co. received
the goods, marked and directed to Leavenworth, in Kansas,
that made them liable to carry them to that place, and for
their value if lost or destroyed on the way"—which was in
accordance with the law of Illinois.  But the Supreme
Court, holding the rule of construction as above stated, fur-
ther said "there was nothing in the case, either from the
location of the parties or the nature of the contract, to
show that they could have had the law of Illinois in view,
or any other law than that of the place where it was made;"
and for excluding the evidence, and giving the instruction
referred to, thereby ignoring the law of that place, the judg-
ment was reversed.

There is no more reason for supposing that the parties here
had in view any other law than that of Iowa.   The contract
itself was clearly intended, at least by appellant, to limit its
liability to the same extent throughout the whole course of
the transportation contracted for.   It is entire and indivis-
ible, and its terms are too plain to admit of construction or
doubt as to its meaning.   Whatever may be the rule when
a contract is divisible and any part is to be wholly per-
formed in a State or States other than that in which it is
made we are of opinion that in a case like this, where the
contract is a unit and to be performed in part in the State
·where made, the *lex loci contractus* must govern as to its
nature, interpretation and effect, wherever it is relied upon
as a ground of action or defense.   Michigan Cent. R. R.
·Co. v. Boyd et al., 91 Ill. 268; the McDaniel & Fairchild cases,
*supra;* Rorer on Inter-State Law, 2d Edition, pp. 68 (and note

6) and 69 (and notes). The limitation, then, being against the law of Iowa, the court below properly instructed the jury that it was of no binding effect here, and the case was submitted to them upon what was understood to be the law of Illinois. Certainly the court was not bound to give effect to that provision of the contract by any rule of comity to the State of Iowa, since it was against the law of that State, nor to consider what might be the law of Indiana since the contract was not made, nor did the alleged cause of action arise, nor was action brought in that State.

By the law of Illinois, Beebe was a passenger for hire, and appellant was " held to the same strict accountability for the negligence of its servants resulting to a passenger who is lawfully and properly on a freight train, as governs its liability for such negligence when the transportation is upon a train devoted to passenger service exclusively." N. Y. C. & St. L. R. R. Co. v. Blumenthal, 160 Ill. pp. 47–8, and cases there cited; and the degree of care required of the carrier for the safety of the passenger is there declared to be " the highest reasonable and practicable skill, care and diligence." C. & A. R. R. Co. v. Arnol, 144 Id. 261.

Since this duty, growing out of the relation of the parties, is imposed by public policy with reference to that relation, responsibility for damages caused by its breach can not be limited by contract to such as result from gross carelessness; and while the law requires proof that the carrier has been negligent, the Blumenthal case further holds that " the happening of an accident to a passenger during the course of his transportation raises a presumption of such negligence," and that " the burden of rebutting this presumption rests upon the carrier." Pp. 48–9, and cases cited.

Besides such a happening here shown, there was evidence directly tending to charge it to improper management of the train, and also to show that Beebe was rightfully in the freight car at the time and not negligently exposing himself to the effect of the jerks which, as it appeared to the only witness who then saw him, against his utmost efforts to prevent it, threw him down and out.

Whether he was in fault for being in it or dangerously near the door was a very material if not the decisive question in the case. The burden of proving that claim was upon appellant, all available testimony upon it being at its command, and it was a question for the jury. We are unable to share the confidence of counsel that their finding was against or without a preponderance of the evidence to support it.

Thus we are of opinion that upon every material question of fact there was such a conflict of evidence as required its submission to the jury, and so much for appellee as to make their finding conclusive if there was no misleading error of the court that may have induced it. Complaint on that score is confined to the ruling on instructions of which thirteen were given for plaintiff, eighteen for defendant—six of them being first modified by the court—and six others refused; including the one directing a verdict for defendant.

Of those given for plaintiff, the first three, the eighth, and the last three, respectively, are claimed to be materially erroneous.

The first is that "the contract offered in evidence, in so far as it required the plaintiff's intestate to feed, water and take care of his stock at his own risk of personal injury arising from the negligence of the defendant's servants, is of no binding force;" and it is said this tells the jury, in effect, that when the train was in motion the risk of personal injury to the decedent was upon the railroad company"—omitting a part as material to its meaning as is the part of Hamlet to the play of Hamlet. Conceding the utmost, what the instruction told the jury was that the company could not by contract require a passenger for hire to do anything on its train at his own risk of personal injury "arising from the negligence of its servants." The contract referred to in the instruction on its face conclusively showed that plaintiff's intestate was a passenger for hire, and the description of the injuries intended, as a class distinguished from others by their origin or cause, namely, the negligence

of the carrier's servants, without addition or qualification, should not be held to embrace those of another and different class, as determined by the same basis of classification, namely, those arising from the negligence of both the carrier and the passenger.   Therefore the injury referred to in the instruction was probably such and certainly might be such as should be caused without the slightest contributory negligence of the passenger.   The risk of such an injury can not, by contract, be put upon such a passenger.   Public policy forbade it, and public policy does not yield to private contract.   Applied to any provision intended to have that effect, the instruction would have been proper.   The only error here was in assuming that the one referred to was so intended.   In our judgment it meant only the risk of injury to the horses from his neglect, or to him by them or otherwise, in the course of his caring for them, without fault of the railroad company.

But that error could not have prejudiced appellant.   Here no damage was claimed for any injury to the live stock or to the decedent by it, and the question of personal injury to him by negligence of appellant, as affected by contract, is fully saved and perhaps more distinctly presented by the exception to the second instruction.   That instruction simply declared the other provision, heretofore quoted, limiting the liability for personal injury to the passenger to those "arising from the gross carelessness of the railroad company," to be void.

The objection urged to it rests entirely upon the assumption of flagrant contributory negligence on the part of Beebe, which is sharply denied on the evidence.   But were it true, that fact would neither help the provision nor hurt the instruction.   For if it would bar a recovery except for willful injury, or negligence gross enough to amount to it, that would be because such is the law in that case, independent of express contract, and not by force or operation of the provision.   That is absolutely nugatory because it attempts by contract to shield appellant against liability for injurious results of its own culpable carelessness (not gross), regardless

of whatever care Beebe should use for his safety; which, as before said, is against public policy. In an instruction upon the naked question of the validity of a particular provision in the contract, the court could not properly refer to alleged but disputed facts, which, if as alleged, could not affect that question. They have their due effect under the law which makes void the provision.

The third construes the contract to mean that Beebe was "required to feed, water, and take care of his stock at his own expense, and that when he was not properly and necessarily so engaged he should ride in the caboose."

Recurring to the contract, hereinbefore quoted, it will be noticed that each of these requirements is in a complete and independent sentence and the two are separated by another intervening, thus: "The owner · will feed, water," etc. * * * Free transportation will be given, etc. * * * Persons so passed will be conveyed at their own risk of personal injury, and must ride in the caboose attached to the train conveying the stock." The clause of the instruction, "when he was not properly and necessarily so engaged," is not in it, nor is any equivalent thereto; and·the word used is not "should" but "must" ride in the caboose.

A railroad company is not bound to carry a shipper of live stock or other property upon its freight train, but may do so if it chooses, in which case it may require him to ride in the caboose, as well for the safety of the passenger as for its own protection. Nobody has denied that the requirement so to do in this case is valid under the Iowa statute, the common law or any law of Illinois. But if the company also requires the shipper of live stock to feed, water and take care of it while on the train, thereby relieving its own servants from that burden, which they must otherwise bear, it necessarily implies a right to him to be in the car conveying it whenever it is necessary or proper for that purpose.

The construction of the contract given by the court in this instruction goes no farther. Counsel argue, however, that in effect it nullifies the contract, because it leaves

" nothing to prevent a shipper caring for his stock all the time, in the car, and would not go near the caboose during the entire time of transit." Hence they contend for what really seems to be the only alternative view—that under the contract he is required to be in the caboose during all the time that " the train is in motion." To admit an exception is to yield the argument; and yet, conceding it to be the rule, there must be exceptions in favor of the shipper's right to care for his stock. The company's servants put the train in motion. It may, on occasion, be proper to do so unexpectedly or be done carelessly, while the shipper is rightfully feeding his stock. It may be reported to him in the caboose that a horse is apparently sick, or loose and making trouble. Many like cases for instant and necessary attention may occur while the train is in motion, or, arising during a stop, require continued attention after it is properly put in motion. All reasonable and practicable protection to the company against the abuse of his right is afforded by the construction complained of, while the one contended for would leave him without reasonable security for its just enjoyment. Whether his being in the car while the train is in motion is within the rule, or the exception, must depend upon the circumstances and be determined by the jury.

A further ground of objection to the instruction, asserted but not argued, is, that it assumed material facts in dispute.

After giving the construction above considered, it proceeds: " and if you believe from the evidence that ' the deceased was properly in the car for the purpose stated,' ' and while he was ' so there ' and in the exercise of ordinary care for his own safety, *was thrown* from and out of the car' *through the carelessness* of defendant's servants as charged, *whereby he received* injuries from which he died, *then* you are instructed that your verdict should be for the plaintiff."

We think the criticism assails the syntax rather than the sense of the instruction, and if just to that extent—which we do not concede—no reason is perceived why the maxim

*mala grammatica non vitiat chartam* should not apply. The language employed, according to good usage, means that the condition, "if you believe from the evidence," attached alike to every clause following down to the conclusion, that "*then*," in that case, you should find for the plaintiff.

There is no foundation in fact for the complaint made of the eighth. It does not state absolutely and without qualification, as asserted, that "if the defendant did not exercise the highest degree of care known to the law the plaintiff was entitled to recover." The instruction is: "If you believe from the evidence the plaintiff's intestate was a passenger traveling in charge of his stock, which the defendant was transporting for hire," then it became the duty of the defendant to exercise for his safety the high degree of care stated, but does not declare the plaintiff entitled to recover upon mere proof of the breach of that duty. On the contrary, after only a semi-colon, it goes on, not "with other matters as independent propositions," but in direct connection with that statement and properly to qualify its effect, as follows: "and if you believe from the evidence that plaintiff's intestate was properly and necessarily in the car, etc., the verdict should be for the plaintiff." We perceive no fault in the instruction.

The last three relate to willful negligence or its legal equivalent, upon the hypothesis that Beebe's being in the freight car was wholly his own fault.

It is claimed there was no evidence upon which to base them; that unless the engineer had notice or reason to suppose he was in that car, he could not have been guilty of willful or gross negligence as to him, in making the crossing as it was made. In this connection the assertion is repeated that both the engineer and the fireman positively swear they did not know that Beebe was in the car with his stock, and that there is no fact or circumstance tending to contradict them.

We find in the record no such positive swearing, and whether it is the more reasonable inference from what the engineer does swear, may be doubted. No question was

asked as to his knowledge or supposition; and all he said
on that subject was, that he saw Beebe, with the train men,
watering his stock at La Salle, and that after they left
La Salle, and between that and Wenona, he did not "see"
him.   He must have seen the conductor assisting Beebe on
the west or right side of the car.   The horses were watered
from that side.   Beebe would have gotten out on that side
to go back to the caboose, the east door being fast closed
by his goods against it.   Had he done so, the engineer, look-
ing to the conductor on that side for a signal, would probably
have seen him.   He got the signal very soon after the last
bucket was handed up, but did not see him.   His inference,
if he noticed and thought anything of the circumstances,
must have been that Beebe was staying in the car for some
reason, presumably good, and that the conductor did not
think it at all important to delay the start on that account
or give him notice of his intention to make it when he did.
These circumstances, unexplained, certainly tend to show
that the engineer and conductor knew or ought to have
understood that he was there when the train left La Salle.
The fireman said he did not see Beebe at all.   Probably he
was on the left or east side of the cab.   But the instructions
asked and given for appellant implied that if the engineer
knew, or from the circumstances ought to have understood,
that Beebe was still in the car when the crossing was made
at Wenona, he could have been guilty of gross negligence
in respect to him, and that there was some evidence tending
to show he had been (1st and 6th as asked and modified).
Whether it was in fact gross, and if so, how gross, were
questions for the jury, and appellant can not now insist that
there was no basis for the instruction upon them given for
appellee.

For reasons appearing from what has been said, we think
there is no substantial ground for complaint of the court's
action upon any of those asked for appellant.   Either the
law, or the evidence, or both, required it to refuse or mod-
ify as it did.

The twenty-seventh and last point stated in the brief, is

that the judgment should be reversed " for improper remarks of counsel to the jury and refusal of the court to rule them out." But it is placed at the head of the argument, as is said " partly because it is believed that the court need go no further in the case, and partly because it is vastly more important to appellant and to all the other railroad com-panies in the State that such procedure should be stopped than the decision of this or any other case."

The remarks referred to, made by counsel for plaintiff in the closing argument.to the jury, were that " these railroad men are compelled to swear for their job, and the big men of the railroad hold over them a club, and they must swear for their job." Immediately following this quotation, the bill of exceptions proceeds thus: " Objected to. The Court: Perhaps that is objectionable. To which the defend-ant then and there objected." Counsel addressing the jury submitted without a word, and so far as appears, did not again offend anybody's idea of propriety.

Upon this state of facts the argument for appellant starts out as follows: " We earnestly submit that it is the impera-tive duty of this court, not only to the appellant, but to the cause of public justice, to a vast number of railroad men, and to maintain ordinary respect for courts in the public mind, to reverse this case for this reason, without regard to any other consideration. Unless trial by jury is to become a mockery and a byword, such conduct can not be allowed to go unrebuked, and a rebuke of this court, without action, will mean nothing."

The judgment here should be reversed only for material error appearing in the record and duly excepted to. In this case it appears that although the court's attention was called to the remarks complained of, at the time, it was only by a simple and general objection, a form requiring no more for a complete disposition of it than to be simply sustained or overruled. There was no refusal to rule them out, for no such ruling was asked. To what was asked the court re-sponded in an expression which was rightly understood as sustaining the objection and amounting in effect to an order

expressly ruling them out as improper. That counsel for defendant so understood it, and were satisfied that the jury also did, is to be inferred from the fact that they did not ask for such order nor for any instruction with reference to the matter. So far, then, we see no error. And here, in our judgment should have been the end of it. The advantage, if any, was with the defendant.

But exception was taken to the court's expression, which is also assigned as one of the reasons in support of the motion for a new trial, and has been so presented in argument here, both printed and oral, that we feel bound to notice it somewhat particularly.

The fault imputed to it is that it is too mild; not sufficiently positive and emphatic. This is a novel objection, proposing an exception to the rule, as universal as any we think of, that a party can not assign for error a ruling in his own favor. But it is insisted that even a pointed rebuke of counsel and severe characterization of his remarks could not fully counteract their prejudicial tendency; that these were due, but that the court should have followed them up by instantly setting aside the verdict, and because it did not this court should reverse the judgment, without regard to the merits or the evidence; and this is based upon the view taken of the grossness of the alleged misconduct, which is expressed as follows: "Without the slightest evidence to support the allegation, he deliberately states that all the thousands of men employed by appellant are perjured scoundrels, who are compelled to, and do, under penalty of loss of employment, go upon the witness stand and swear, not to the truth, but whatever they are commanded to do by the officers of the company, and that these officers themselves, in all cases where they think it necessary to enable them to win a verdict, are guilty of subornation of perjury. Indeed, the charge is against all the railroad men in the country—one-eighth of the entire laboring population."

This is very far from being a just representation of what was said, as we see it. It is hardly supposable that any lawyer in his sober senses, to a jury in the presence of a

judge, under whatever provocation, could make charges so sweeping, irrelevant, groundless, palpably false and absurdly extravagant. They could not excite any prejudice against any witness or the party for whom he testified, but would have exposed himself to crushing rebuke by the court, impaired his influence with the jury and tended to weaken his client's case. That he was not rebuked, and that he got a verdict in her favor, are facts affording some proof that neither the court nor the jury so understood him ; and we are hardly able to recognize in the picture a single feature of the original. Considered by itself, as a single sentence from an extended oral argument in reply, it is probable that however it may have been as to the idea, the form of its expression was not very "deliberately" framed, but in the heat of controversy the strongest that occurred to the speaker was used. In the next place, the language so used was not intended to include, nor in strictness did it include, "all the thousands of men employed by appellant," much less "all the railroad men in the country." The words were : "These railroad men," and Worcester says "these," which is the plural of "this" and opposed to "those," relates to "the persons or things nearest or last mentioned, and 'those' to the most remote or first mentioned." Thus the reference was not general, to all employes of the appellant, but particular and limited, as the context clearly shows, to witnesses whose alleged negligence was the cause of the action against their employer, in whose behalf they were called. The question under discussion manifestly was the weight to be given to their testimony, as affected by their interest in the event of the suit. A striking metaphor was employed to show a deep interest, depending on the power of the big men of the company to discharge them for negligence in the performance of their duties. They are not the only men who hold such a club over their employes. But they certainly have that power, and should use it whenever, in their judgment, the occasion justifies it. The assertion that they have it and use it does not import or imply any fault or wrong on their part, but is rather a commen-

I. C. R. R. Co. v. Beebe.

dation.  In the language complained of we perceive no inti-
mation that they are ever guilty of subornation of perjury.
Its point is, that all their employes know they have this
power and are likely to use it whenever one is convicted out
of his own mouth of an act of carelessness in the perform-
ance of his duty, which causes the death of a passenger and
subjects the company to payment of the consequent dam-
ages; and hence an inference of a strong interest and power-
ful motive to misstate or color the facts which, if shown,
would so convict him.  In such a statement there would be
nothing objectionable.

But in his statement of the power and effect of this in-
terest as a motive, counsel said the witnesses referred to
were " compelled " and " must " swear for their job.  These
terms literally import a moral necessity.  The statement
was not of matter of fact, but of opinion.  Conceding that,
taken strictly, it was too strong, even as an opinion, there
is little room for a supposition that it was intended to be or
was so taken.  It is by no means an uncommon form of
speech to express the effect of a strong motive or tempta-
tion; as where it is said that hunger compelled one to steal,
or fear of shame to conceal himself, which are not literally
cases of compulsion, but of choice between evils.  Here the
jury knew that the witnesses could have told the truth if
they would, and that counsel also knew it; and counsel was
doubtless aware that they knew he knew it; for everybody
knows that threatened deprivation of a particular employ-
ment does not and can not properly be said to necessitate the
commission of willful and corrupt perjury by the employe.
We are therefore confident that this verbal inaccuracy did
not mislead or improperly influence the jury; and we see no
other fault in the language of which so much complaint
was made, considered by itself.

But fairness requires us to add that even this inaccuracy
was not without provocation.  The bill of exceptions ex-
pressly states that it was in direct reply to the following
statement made by counsel for defendant in the last preced-
ing argument:  " The railroad men who testified in this

case are men who have no interest whatever in the case, and are fair and honest witnesses, and you have a right and should give their testimony the same weight and consideration as the testimony of other witnesses."

They testified either that there was no unusual jerking or bumping of the cars in crossing the Alton road, or that they did not observe any such, which was in conflict with the testimony of six witnesses for plaintiff, who were shown to be entirely disinterested, to the effect that there was, and that they did observe it at the time. The question was a very material one, being the foundation of plaintiff's alleged cause of action, and the jury were to decide it according to their judgment of the weight of evidence; and in forming that judgment, the interest of the witnesses in the event of the suit, if any appears, is proper to be considered.

Now the statement above quoted, as to the *status* of the witnesses referred to—at least as to that of the conductor and engineer—and the duty of the jury, were incorrect. While all were alike liable to be discharged for negligence, if shown, and interested to hold their jobs, we do not say there was any evidence of it on the part of the fireman or brakeman, but there clearly was some which tended to inculpate the two first mentioned. If guilty, they would be responsible to the company for all damages resulting from such negligence which it is compelled to pay, and the record in this case would be competent evidence against them. G. & C. U. R. R. Co. v. Welch, 24 Ill. 31; C. & R. I. R. R. Co. v. Hutchins, 34 Id. 108. This was certainly a large interest to defeat the plaintiff. Before the 1st of July, 1872, they would have been disqualified to testify at the instance of the company by reason of it, and the statute which made them competent expressly declares that such interest may still be shown for the purpose of affecting their credibility. Therefore, neither the court nor counsel could properly tell the jury that they "should" give their testimony the same weight as that of other witnesses. These statements being incorrect and prejudicial to plaintiff, it was her counsel's duty to reply to them as forcibly as he fairly could. The

comparative credibility of these opposing witnesses upon a vital point was a matter of too much importance to be slighted. A good deal of earnestness, and naturally some extravagance of assertion, were to be expected, and here we have them on both sides. But for the reasons stated we think the single fault noted on the part of plaintiff's counsel was too trivial and harmless to amount to misconduct calling for a pointed rebuke. The trial judge was in better position to see his duty under the circumstances than are we, and is entitled to every reasonable presumption that his action was in full discharge of it. His mild admonition had effect to correct the fault and prevent its repetition, which is all that is ordinarily needed in such cases. N. C. St. Ry. Co. v. Cotton, 140 Ill. 502–3, presents some very forcible and pertinent observations on this subject.

We have examined all the Illinois cases and some others cited for appellant on this point, but find none that in our judgment is not clearly distinguishable on principle from the case at bar.

Finding in the record no material error the judgment will be affirmed.